1

2

3

4

5

6

7

8           IN THE UNITED STATES DISTRICT COURT

9          FOR THE EASTERN DISTRICT OF CALIFORNIA

10   ANDRE LUIS ORTEGA,

11              Petitioner,              2: 08 - cv - 1657 - KJM TJB

12        vs.

13   KEN CLARK, Warden,

14              Respondent.          FINDINGS AND RECOMMENDATIONS

15   _____/

16                   I.  INTRODUCTION

17        Petitioner, Andre Luis Ortega, is a state prisoner proceeding *pro se* with a petition for writ

18   of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner is currently serving a sentence of life

19   imprisonment without the possibility of parole after being convicted by a jury of first degree

20   murder.  Petitioner raises several claims in this federal habeas petition; specifically: (1) his due

21   process rights were violated when the prosecutor was permitted to proceed on a felony-murder

22   theory based upon a robbery at trial ("Claim I"); (2) there was insufficient evidence to support the

23   gang related findings because it was not established that the Nortenos are a criminal street gang

24   ("Claim II"); (3) prosecutorial misconduct ("Claim III"); (4) his due process and equal protection

25   rights were violated by the admission of uncharged offense evidence ("Claim IV"); (5) his due

26   process and equal protection rights were violated when the prosecutor was allowed to ask the

1

gang expert at trial whether Petitioner's tattoos showed a propensity for violence ("Claim V");

and (6) his due process and equal protection rights were violated when the prosecutor gave the

jury a chart during closing argument that was eventually brought in by the jury during their

deliberations ("Claim VI").  For the following reasons, Petitioner's habeas petition should be

denied.

## II.  FACTUAL AND PROCEDURAL BACKGROUND[1]

Placer County Sheriff's Deputy Paul Long testified he responded to a report of a burglary in Newcastle, California on January 10, 2002. The address to which he reported was the residence and work address of Miller and Aggie Lee, husband and wife.  Aggie ran a palm-reading business from that location.  The Lees reported that guns, coins, credit cards, and heirloom jewelry had been stolen. Two days after the burglary report Miller Lee told Deputy Long they had received information that the burglar was Steve Adams from Stockton.  Deputy Long investigated and discovered that Steve Adams's address in Stockton was a palm reading business, and that Gary, Walter and Lucy Adams were also related to that address.

Some of the jewelry the Lees reported as stolen turned up in a pawn shop in Stockton.  Miller Lee purchased some of the jewelry that had a sentimental value, but one piece, a diamond bracelet, was not recovered from the pawn shop.  The Placer County Sheriff's Department received almost daily calls from Miller Lee asking for the status of the investigation into the burglary.  Miller Lee called less frequently after sheriff's deputies informed him there was no evidence linking Steve Adams to the crime.  The calls from Miller Lee ended sometime in February 2002.

Steve Adams's mother left Steve with Walter and Walter's sister Dolly when Steve was a baby.  Steve was referred to as Walter's adopted son.  Dolly and her sisters worked at a palm reading business on East Harding Way in Stockton.  The Adamses refer to themselves as gypsies or Yugoslavians.  Dolly had heard accusations from other gypsies that Steve was robbing gypsies from out of town.

Walter had a Ford Explorer he had been trying to sell for a while. On the morning of the murder, October 23, 2002, Dolly received a phone call asking whether they had a car for sale.  When Dolly told

---

[1] The factual background is taken from the California Court of Appeal, Third Appellate District opinion dated December 20, 2006 and filed in this Court by Respondent on July 28, 2009 as Lodged Document 4 (hereinafter referred to as "Slip Op.").

1   the caller they did, he said he would come take a look at it.  Dolly
    told the caller that the car was not there at the time, and he hung
2   up.  The man called again in the afternoon, saying he was coming
    in from the Fresno area to take a look at the car, and bringing his
3   aunt, who had the money to buy the car.

4   Two young Hispanic men arrived to look at the car.  Walter left in
    the car with the two young men around 2:30 p.m.  Walter was
5   wearing a gold bracelet he had possessed for four or five years.
    Dolly became concerned after 30 or 40 minutes had passed and
6   Walter had not come back.  Dolly had a friend take her to the mall
    around 6:00 p.m. to see if Walter's car might be in the parking lot.
7   They could not find it, and by the time they got back home Steve
    had called the police.
8
9   The next morning at around 9:00 a.m., Stockton police investigator
    David Anderson was dispatched to the west frontage road of
10  Highway 99 when a report came in that a Ford Explorer had been
    found with Walter Adams's body inside.  Walter's body was in the
11  passenger seat.  There were rope burns from his mouth to his ear
    lobes, several gunshot wounds to his right shoulder area, and a
12  rope was draped around his chest.  Three expended shell casings
    from a .380 caliber semi-automatic handgun were in the driver's
13  seat area, one was in the center console, one was on the right rear
    floorboard, and a sixth one was underneath the victim.  The
14  victim's wallet containing $11 was in his right rear pants pocket,
    but he was not wearing a bracelet.

15  Officer Anderson's observations led him to conclude someone had
    been sitting in the back seat of the vehicle when the victim was
16  killed.  His conclusion was based on the fact that the driver's seat
    was pushed completely forward as if someone had exited the
17  vehicle on the driver's side from the back seat.  [FN 2]  The
    vehicle could not have been driven with the seat in that position.
18  The rope burns on the victim's mouth were unlikely to have been
    caused by a person in the front seat, because a person could not
19  have exerted enough pressure from that position.  Also, the ends of
    the rope, which was still draped over the victim, were pointed over
20  his shoulders towards the back of the seat.  The gunshot wounds
    came from a position directly above the victim into his right
21  shoulder.  There were no bullet holes indicating the victim was
    shot from the front, because those bullets would have exited the
22  victim's body and gone into the seat.  The location of the shell
    casings was consistent with someone in the back seat having fired
23  the gun, although it was also possible from the casings that the
    shots could have come from the driver's seat area.
24  [FN 2]  The Explorer was a two-door vehicle.

25  The Explorer was processed for fingerprints.  [Roque] Bejarano's
    fingerprint was discovered on the exterior of the passenger
26  window, his left palm print was on the interior of the driver's door,

3

1   and his right palm print was on the exterior of the passenger door.
    Defendant's fingerprint was discovered on the exterior of the
2   passenger door window frame.

3   Dr. Robert Lawrence preformed Walter's autopsy.  He determined
    Walter died as the result of massive hemorrhage and shock from
4   multiple gunshot wounds.  The gun muzzle had been either in
    contact with the victim's skin or within less than an inch.  Dr.
5   Lawrence was also of the opinion that the shooter had been in the
    back seat behind the passenger.  He opined the person in the back
6   seat had been holding onto the rope with one hand and reaching
    around with the gun and firing downward.  It was not likely that
7   the shooter was either in the driver's seat or standing outside on the
    passenger side of the vehicle.  Dr. Lawrence did not go to the crime
8   scene, and did not know if there was any blood spatter inside the
    vehicle.

9
    Noori Zamanian, who lived on Highway 99 frontage road, called
10  the Stockton Police Department the morning of October 25, 2002,
    after reading a newspaper article about the victim's body and truck
11  having been found.  Zamanian reported two Hispanic males had
    come to his house two days earlier and asked to use the phone.
12  Police officers removed Zamanian's telephones and tested them for
    latent prints.  Defendant's fingerprint was found on one of the
13  telephones.

14  Defendant was the first of the three suspects to be arrested and
    interrogated.  He told investigators that he, Bejarano, and [Robert]
15  Sisneros had gone to Stockton in Sisneros's vehicle to find
    someone that had committed a robbery, to scare the person, and to
16  send him a message to stop robbing.  They spent and hour or two
    looking for the person, and when they were unable to find him,
17  decided to find the person's father and send the message to him
    instead.  They knew the father had a vehicle for sale, so they called
18  the number and pretended they wanted to test drive the vehicle in
    order to make contact with the father.

19
    The three agreed that defendant and Bejarano would go with the
20  victim on the test drive, and Sisneros would follow them in his car.
    They were on the freeway when the victim said he had an
21  appointment and needed to go back.  Bejarano, who had been
    driving, pulled over to let the victim take the driver's seat.  When
22  Bejarano reached for the driver's door, defendant threw a rope over
    the victim's head.  He intended to put the rope around the victim's
23  neck, but it got caught on his mouth.  By this time Bejarano was
    standing outside the passenger door and saw the rope was caught in
24  the victim's mouth.  He told defendant, "[y]ou got to do it[,]" so
    defendant pulled out a gun and fired.  He was sitting directly
25  behind the victim when he shot him.

26  Defendant and Bejarano ran across the freeway to the other side of

4

the frontage road, where they asked a resident if they could use his phone to call for a ride. Sisneros had not followed them, and they had no idea where he was. Defendant first tried to call his cell phone, then called his home phone in Sacramento. He spoke with Marissa, Bejarano's girlfriend, and told her to contact Sisneros to come pick them up. Shortly after that, Sisneros picked them up and they went back to Sacramento.

Defendant admitted he had joined the Nortenos when he was 10 or 11 years old. Defendant said there was no way to get out of the gang, but he did get away from the crowd and try to stick to himself.

Bejarano testified at trial pursuant to a plea agreement. He stated that on October 22, 2002, defendant asked him if he wanted to go somewhere the next day and make some money. It was Bejarano's understanding they were going to do a "lick," i.e., some criminal activity for the purpose of monetary gain. The next morning Bejarano agreed to do the lick. Sisneros picked up the two of them and they drove from Sacramento to Stockton. Sisneros said they were looking for someone and they began driving around Stockton searching for that person.

Bejarano was aware defendant had a gun because he had seen it. While they were driving around, Sisneros made a lot of phone calls regarding the fact that they could not find the person for whom they were searching. Eventually, Sisneros made a phone call and told the person on the other end they could not find the target, but that they had seen the target's father. When Sisneros hung up, he said they were going to go look for the dad.

They went to a palm reading shop and Bejarano called the number from a "for sale" sign on an Explorer parked in front of the shop. A woman answered and told Bejarano the owner of the vehicle was not in, and that he should call back. Bejarano called back later and said he was coming from Fresno and wanted to test drive the vehicle. They waited another 30 to 40 minutes before going back to the palm reading business. During that time they talked about what was going to happen. While Bejarano drove the Explorer, defendant was going to sit in the back seat and strangle the man with a rope obtained from the back of Sisneros's car. Defendant did not want to shoot the man because he did not want to leave shells behind at the scene. Sisneros told them the man was wearing a diamond bracelet and expensive diamond ring, and to be sure and get the jewelry. Bejarano did not know why the man was being killed, other than Sisneros said it was to send a message to the man's family.

As Bejarano was driving the Explorer, he noticed Sisneros following them at first, but then noticed he was not there. He drove the car onto Highway 99. After he went past a couple of

5

exits, the victim said he needed to get back for an appointment. Bejarano pulled over and told the victim he did not know the area and did not know which road to take. The victim said he would drive. Bejarano was out of the car, and the victim had opened the passenger door when defendant put a rope over the victim's head. Bejarano ran around to the passenger side and told defendant the rope was in the man's mouth. Bejarano shut the door because he figured defendant was going to shoot the victim. Bejarano heard defendant shoot the victim five or six times. Bejarano and defendant ran away from the vehicle. They ran over to an overpass, went to a house and knocked on the door. No one answered at the first house, but when they went to a second house a man came out from the side of the house. They told him their car had broken down on the freeway and they needed to use the phone. Defendant made the phone call. They waited outside, and Sisneros soon came and drove them back to Sacramento.

During the drive, Bejarano saw defendant holding the diamond bracelet the victim had been wearing. At one point during the drive Sisneros talked to someone on the phone to let them know the deed was done and to set up a meeting. They met that evening in a parking lot in the Sunrise area of Sacramento. Sisneros met the person in a parking lot. As they were driving away from the meeting Sisneros said he got $2,000 for the job. He gave defendant some of the money, and defendant gave Bejarano $200. Sisneros said he had shown the guy the bracelet to let him know the job was done.

Bejarano had performed a lick previously with defendant when defendant asked him to go to Willits, California and steal some marijuana plants. They did that lick with Raymond Royal and Raymond Rios. Bejarano thought Royal might have been associated with the Oak Park Bloods. When they took the marijuana plants, Bejarano and Royal went to the backyard while defendant held the people in the house at gunpoint. At one point someone tried to grab some of the plants from Royal, and Royal shot him. Both defendant and Royal had guns for the Willits robbery. Defendant's gun was a .380 caliber automatic handgun, the same handgun he used to kill Walter Adams. When police were dispatched to the Willits robbery, they found a man with two gunshot wounds to his chest, a woman with a gunshot wound to her knee, and a man with blunt force trauma to the head. Bejarano testified that defendant sported gang tattoos, and that he was once a member of the Norteno gang. Bejarano was not sure whether defendant considered himself a gang member at the time of the Adams murder. When police interviewed Bejarano in January 2003, he told them both defendant and Sisneros were members of the Norteno gang. He stated he "associated" with Nortenos. Bejarano admitted he had entered into a plea agreement by which he would receive 18 years in prison in exchange for his truthful testimony.

6

Sisneros also admitted he entered into a plea agreement after being charged with the murder of Walter Adams.  In exchange for his truthful testimony, he agreed to a 20 year prison sentence.

Sisneros testified he was related to gypsies Johnny Mitchell and Miller Lee.  Sometime in 2002, Miller Lee approached him and defendant about some property that had been stolen from Lee, and asked if Sisneros would be interest in trying to recover it.  Lee said he wanted Sisneros to recover the property and scare the man who had stolen it.  Sisneros said the gypsies treated him with respect because he had been incarcerated, and they assumed he was someone to fear.

Lee and Mitchell drove Sisneros to Stockton and took him by several houses where they believed Steve Adams might be living.  One was a palm reading shop.  Sisneros said they were just supposed to scare Adams, and Sisneros expected no compensation for it.

Sometime in October Sisneros called a couple of people to help him with the job.  One of those people was defendant.  Defendant and Sisneros were Nortenos, were known to have guns, and defendant was not afraid to use a gun.  Bejarano also went with them to do the job.  Bejarano was also a Norteno.

On the day of the murder Sisneros kept in telephone contact with Lee and Mitchell.  They discussed where Sisneros might be able to find Steve Adams.  The plan was to scare Steve by beating him up.  Sisneros, Bejarano and defendant went several places, but could not find Steve's car.  Sisneros told Lee there was a red Ford Explorer in front of one house, and Lee told him he thought the Explorer belonged to Steve's father.  Lee said that since the father was not taking responsibility for his son, they should send a message to the father.  Lee told Sisneros the victim wore expensive jewelry, and that some of it might belong to Lee.  He wanted Sisneros to retrieve the jewelry.  Sisneros told defendant and Bejarano this.

There was a "for sale" sign in the back of the Explorer.  Miller told Sisneros to call the number.  Bejarano agreed to make the phone call.  Bejarano and defendant went to test drive the vehicle, and Sisneros planned to follow them in his car and pick them up afterward.  However, Sisneros got stopped by a train and lost contact with the Explorer.  When Sisneros could not find them, he headed back to Sacramento.  Within about 20 minutes, he got a call from one of the men's girlfriends telling him defendant and Bejarano were stranded.  Sisneros went to pick them up.  He exited the freeway when he saw the Explorer on the side road, and soon saw Bejarano and defendant walking.  After they got in the car, Bejarano showed Sisneros the bracelet he got from the victim.  They discussed whether they could get any money for it.  Defendant told Sisneros he emptied the gun into the victim, and

1    Bejarano took off running.

2    Sisneros got a phone call from Lee, and he told Lee they had the
     victim's bracelet. Lee said he wanted it. Lee told Sisneros to meet
3    him in Sacramento. The three of them met Lee and Mitchell in a
     parking lot. Lee said he would get money to buy the bracelet.
4    When Sisneros told Lee and Mitchell that Walter was dead,
     Mitchell said he got what he deserved.
5
     After meeting with Lee and Mitchell, Sisneros dropped off
6    defendant and Bejarano at a chicken place. He gave them $200 so
     they would have some money.
7
     About a week later Sisneros met Lee again. He had given Lee the
8    bracelet, and Lee paid him $3,500. He gave $100 to Bejarano.

9    Defendant testified at trial, and recounted a series of events that
     differed in several material respects from the statement he gave
10   police shortly after the murder. He testified that Sisneros never
     told him why he wanted defendant to go out of town with him. He
11   said he rode with Sisneros and Bejarano to Stockton, where they
     drove around to a couple of different locations, including a palm
12   reading shop. Later, they were shopping when Sisneros and
     Bejarano told him Sisneros had contacted his cousin and the cousin
13   told him where they could locate someone. Defendant did not
     know why they were trying to locate the person, and he was not
14   curious about it. They went to a palm reading shop and Sisneros
     told him Bejarano was interested in buying a car. They got the
15   number off of a "for sale" sign in the back window of a red
     Explorer. Defendant did not decide to go on the test drive with
16   Bejarano until the last minute.

17   When Bejarano pulled the car over so that the victim could drive
     back to his house, Bejarano pulled a gun on him. The victim asked
18   what was going on, and Bejarano told him his son had robbed Lee.
     Bejarano tossed a rope to defendant. The victim reached for
19   Bejarano's gun and started fighting with Bejarano. Defendant
     panicked and threw the rope over the victim to get him to let go of
20   the gun. Bejarano was standing outside the driver side door when
     he shot the victim six times. The victim was leaning over the
21   center console with his head over the driver's seat.

22   Later, Sisneros told him that if anyone questioned him he should
     take the blame for the killing because he was the youngest one and
23   would be out in a couple of years. He said if defendant did not
     keep quiet he would suffer the consequences later. Defendant
24   testified that even though he had a gang tattoo on his back, he was
     never a gang member. He did, however, hang out with a lot of
25   gang members.

26   Defendant's version of events was supported by the testimony of

                                   8

Duane Lovaas, a Department of Justice criminalist. He theorized that the shooter was the driver or was in the driver's position. His opinion was based on the location of the cartridge casings and the blood splatter evidence.

Deputy Ronald Aurich testified as an expert in criminal street gangs. He explained that Norteno is a criminal street gang made up of 20 to 25 different subsets in the Sacramento area. The subsets also have neighborhood affiliations. Aurich opined that defendant was a Norteno, and specifically a Barrio North Side Norteno. Aurich's opinion was based on defendant's gang logo tattoos, involvement in gang-related crimes, and the fact that he kept company with validated gang members. Aurich testified he had reviewed documentation indicating defendant admitted his gang membership to the juvenile county probation officer.

Aurich opined that Sisneros was also a gang member. His opinion was based upon the Norteno prison gang symbols tattooed on Sisneros's chest, his involvement in gang related crimes, the fact he had been in prison, and that he kept company with other gang members. Aurich also opined Sisneros was a gang member with a certain status above a common gangster from the neighborhood.

Aurich opined that Bejarano was a Norteno gang member, based upon his association with other gang members, the crimes in which he was involved, the neighborhood in which he lived, and the people with whom he associated.

In Aurich's opinion Walter Adams's' murder was gang related.

(Slip Op. at p. 3-17 (footnote omitted).)

Petitioner was convicted by a jury and sentenced to life imprisonment without the possibility of parole. On direct appeal to the California Court of Appeal, Third Appellate District, Petitioner raised the issues that he raises in this federal habeas petition (amongst others). On December 20, 2005, the California Court of Appeal affirmed the judgment. Petitioner then filed a petition for review in the California Supreme Court. In April 2007, the California Supreme Court summarily denied the petition for review.

In July 2008, Petitioner filed the instant federal habeas petition. Respondent answered the Petitioner on July 27, 2009.

### III. APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

An application for writ of habeas corpus by a person in custody under judgment of a state

1    court can only be granted for violations of the Constitution or laws of the United States.  See 28

2    U.S.C. § 2254(a); see also Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1993); Middleton v.

3    Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)).

4    Petitioner filed this petition for writ of habeas corpus after April 24, 1996, thus the Antiterrorism

5    and Effective Death Penalty Act of 1996 ("AEDPA") applies.  See Lindh v. Murphy, 521 U.S.

6    320, 326 (1997).  Under AEDPA, federal habeas corpus relief is not available for any claim

7    decided on the merits in the state court proceedings unless the state court's adjudication of the

8    claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of,

9    clearly established federal law, as determined by the Supreme Court of the United States; or (2)

10   resulted in a decision that was based on an unreasonable determination of the facts in light of the

11   evidence presented in state court.  See 28 U.S.C. 2254(d).

12        As a threshold matter, this Court must "first decide what constitutes 'clearly established

13   Federal law, as determined by the Supreme Court of the United States.'"  Lockyer v. Andrande,

14   538 U.S. 63, 71 (2003) (quoting 28 U.S.C. § 2254(d)(1)).  "'[C]learly established federal law'

15   under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court

16   at the time the state court renders its decision.'"  Id. (citations omitted).  Under the unreasonable

17   application clause, a federal habeas court making the unreasonable application inquiry should ask

18   whether the state court's application of clearly established federal law was "objectively

19   unreasonable."  See Williams v. Taylor, 529 U.S. 362, 409 (2000).  Thus, "a federal court may

20   not issue the writ simply because the court concludes in its independent judgment that the

21   relevant state court decision applied clearly established federal law erroneously or incorrectly.

22   Rather, that application must also be unreasonable."  Id. at 411.  Although only Supreme Court

23   law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in

24   determining whether a state court decision is an objectively unreasonable application of clearly

25   established federal law.  See Clark v. Murphy, 331 F.3d 1062, 1070 (9th Cir. 2003) ("While only

26   the Supreme Court's precedents are binding . . . and only those precedents need be reasonably

10

1    applied, we may look for guidance to circuit precedents.").

2        The first step in applying AEDPA's standards is to "identify the state court decision that

3    is appropriate for our review."  See Barker v. Fleming, 423 F.3d 1085, 1091 (9th Cir. 2005).

4    When more than one court adjudicated Petitioner's claims, a federal habeas court analyzes the

5    last reasoned decision.  Id. (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).  The last

6    reasoned decision in this case came from the California Court of Appeal on direct appeal.

7                        IV.  ANALYSIS OF PETITIONER'S CLAIMS

8        A.  Claim I

9        In Claim I, Petitioner argues that the trial court erred in instructing the jury on a theory of

10   felony-murder based upon a robbery despite the fact that the magistrate judge had found as a

11   factual matter at the preliminary hearing that the evidence of the robbery was insufficient.

12   Petitioner basis this argument on the theory of collateral estoppel.  Petitioner also alludes to the

13   fact that he had no notice of this charge such that his due process rights were violated as well.

14   The California Court of Appeal analyzed this claim in its decision and stated the following:

15                  The amended complaint contained a robbery count and a special
                    circumstance allegation that defendant committed the murder while
16                  engaged in the commission of a robbery pursuant to Penal Code
                    section 190.2, subdivision (a)(17)(A).  At the preliminary hearing,
17                  the court found insufficient evidence to hold defendant over on
                    these charges.  The court found there was "insufficient evidence to
18                  establish that the murder was carried out to advance the
                    commission of a robbery, rather the evidence suggest[ed] that the
19                  robbery was incidental to the murder."  The information filed
                    thereafter did not include either the robbery special circumstance
20                  allegation or a robbery count.

21                  Defendant filed a motion in limine arguing the prosecution was
                    precluded from advancing a felony murder theory based on robbery
22                  or presenting any evidence that the homicide was committed
                    during the course of a robbery.  The court denied the motion,
23                  finding, "a particular theory of murder doesn't necessarily have to
                    be proved at the preliminary hearing, as long as the defendant's on
24                  notice that the theory might be advanced at trial."

25                  Thereafter, the trial court instructed the jury that the prosecution
                    contended defendant was guilty of first degree murder on three
26                  theories:  deliberation and premeditation, lying in wait, and felony

                                        11

murder.  The felony murder theory was based on an unlawful
killing occurred during the commission or attempted commission
of the crime of robbery.  The court instructed that the jurors were
not required to unanimously agree on the particular theory of first
degree murder as long as they unanimously agreed he was guilty of
first degree murder under any of the theories.

Defendant argues the doctrine of collateral estoppel precluded the
prosecution from trying the case on any theory of robbery.
Collateral estoppel bars the relitigation of an issue decided in a
previous proceeding if:  (1) the issue was actually and necessarily
decided in the prior proceeding; (2) the prior proceeding resulted in
a final adjudication on the merits; and (3) the party against whom
collateral estoppel is asserted was a party or in privity with a party
in the prior proceeding.  (People v. Davis (1995) 10 Cal.4th 463,
514, fn. 10.)

However, the doctrine of collateral estoppel does not apply to
orders dismissing criminal proceedings following a preliminary
hearing.  (People v. Wallace (2004) 33 Cal.4th 738, 749.)  It is also
questionable whether collateral estoppel even applies to further
proceedings in the same litigation.  (People v. Memro (1995) 11
Cal.4th 786, 821.)

In any event, the advancement of a felony murder theory was
harmless beyond a reasonable doubt.  The jury was instructed on
three theories by which it could find defendant guilty of murder in
the first degree: (1) premeditated murder, (2) felony murder
(robbery), and (3) lying in wait murder.  While the jury may have
based its finding that defendant was guilty of first degree murder
on one or all three theories advanced by the prosecutor, it
necessarily found that defendant was guilty of lying in wait murder.
This is so because the jury found true the special circumstance
allegation that the murder was committed by means of lying in
wait.  The requirements for the lying in wait special circumstance
are more stringent than those for lying in wait murder, and if the
evidence supports the special circumstance, it necessarily supports
the theory of first degree murder.  (People v. Moon (2005) 37
Cal.4th 1, 22.)

Defendant also claims he was denied due process because he was
forced to defend against a charge of which he had no notice.  This
is simply incorrect.  Defendant obviously had notice the
prosecution intended to argue a felony murder theory, since he
brought a motion in limine to prevent it.

(Slip Op. at p. 17-20.)

        The United States Supreme Court has incorporated the principles of collateral estoppel

into the protections of the Double Jeopardy Clause.  See Ashe v. Swenson, 397 U.S. 436, 443-45

12

1  (1970); United States v. James, 109 F.3d 597, 599 (9th Cir. 1997).  Collateral estoppel means

2  that "when an issue of ultimate fact has once been determined by a valid and final judgment, that

3  issue cannot again be litigated between the same parties in any future lawsuit."  Ashe, 397 U.S. at

4  443.  The government can however litigate a case under alternative theories of a crime.  See

5  Williams v. Warden, 422 F.3d 1006, 1011 (9th Cir. 2005).  Collateral estoppel involves a three-

6  step analysis:

> First, the issues in the two actions are identified so that we may
> determine whether they are sufficiently similar and material to
> justify invoking the doctrine.  Second, we examine the first record
> to determine whether the issue was fully litigated.  Finally, from
> our examination of the record, we ascertain whether the issue was
> necessarily decided.

11  James, 109 F.3d at 600 (internal quotation marks and citation omitted).  The determination of

12  whether an issue was "necessarily decided" turns on whether the issue of fact or law was actually

13  litigated and determined by a valid and final judgment and is essential to that judgment.  See,

14  e.g., Bobby v. Bies, 129 S.Ct. 2145, 2152 (2009).

15          In this case, the magistrate judge found as a factual matter that the evidence of robbery

16  was insufficient at the preliminary hearing.  However, the subsequent argument and felony-

17  murder instruction by the court at trial did not run afoul of the collateral estoppel principles to

18  warrant granting Petitioner federal habeas relief on this Claim.  As the Ninth Circuit has noted, a

19  "dismissal at a preliminary hearing has no preclusive effect under California law," and "an initial

20  dismissal for lack of probable cause is never a binding determination on the lack of probable

21  cause," and a dismissed action can be re-filed.  See De Anda v. City of Long Beach, 7 F.3d 1418,

22  1422 & n.6 (9th Cir. 1993).  As the California Supreme Court has explained:

> It has long been the rule in [California] that a magistrate's
> dismissal of criminal charges following a preliminary examination
> does not bar the People from either refiling the same charges
> before another magistrate or seeking an indictment based upon
> those charges . . . . [T]he magistrate lacks the power to make a
> finding regarding the guilt or innocence of the accused, for the
> magistrate's authority is limited to determining whether sufficient

13

1    or probable cause exists to hold the defendant for trial.
     Accordingly, as the magistrate has no power to make a
2    determination on the merits of the case before him, there is no
     room for the application of the doctrines of res judicata or
3    collateral estoppel.

4    People v. Uhlemann, 9 Cal.3d 662, 664, 108 Cal. Rptr. 657, 511 P.2d 609 (1973); see also

5    People v. Wallace, 33 Cal. 4th 738, 749, 16 Cal. Rptr. 3d 96, 103, 93 P.3d 1037 (2004) ("[w]hen

6    a magistrate declines to hold a defendant to answer on the ground that the evidence at the

7    preliminary hearing did not establish probable cause to believe the defendant committed the

8    charged offense, the ruling does not bar future prosecution").  Here, the mere fact that the

9    magistrate judge found insufficient evidence at the preliminary hearing on the felony-murder

10   (robbery) charge does not implicate collateral estoppel since it was not "fully litigated" by the

11   magistrate judge's finding at the preliminary hearing.

12       Additionally, as noted by the California Court of Appeal, the advancement of the felony-

13   murder theory was harmless.  Petitioner would not be entitled to federal habeas relief on this

14   claim unless the constitutional violation had a substantial and injurious effect or influence in

15   determining the jury's verdict.  See Brecht v. Ahrahamson, 507 U.S. 619, 637 (1993); see also

16   Hedgpeth v. Pulido, 555 U.S. 57, 129 S.Ct. 530, 532 (2008) (per curiam) ("harmless error

17   analysis applies to instructional errors so long as the error at issue does not categorically vitiat[e]

18   all the jury's findings . . . An instructional error arising in the context of multiple theories of guilt

19   no more vitiates all the jury's findings than does omission or misstatement of an element of the

20   offense when only one theory is submitted") (internal quotation marks and citations omitted).

21   Here, the first-degree murder charge proceeded on three theories:  (1) premeditated murder, (2)

22   felony-murder (robbery) and (3) lying in wait murder.  The jury made a specific finding that the

23   murder of Walter Adams was committed by means of lying in wait within the meaning of

24   California Penal Code § 190.2(a)(15) which provides that the penalty for a defendant found

25   guilty of first-degree murder by lying in wait is death or life imprisonment without the possibility

26   of parole.  See also Cal. Penal Code § 189 (stating that murder perpetrated by lying in wait is

14

1    murder in the first degree).  Therefore, even though the jury was instructed on felony-murder, any

2    purported error would have been harmless as the jury specifically found that Petitioner was guilty

3    of first-degree murder for lying in wait.

4           Finally, Petitioner argues that his due process rights were violated when he was not

5    provided with the requisite notice that the prosecutor was going to raise the felony-murder

6    (robbery) first-degree murder theory at trial.  Respondent admits in his answer that the "primary

7    charging documents did not specifically charge Petitioner with felony murder."  (Resp't's

8    Answer at p. 22.)  For the following reasons, federal habeas relief should not be granted on this

9    lack of notice argument.

10          The Sixth Amendment guarantees a criminal defendant the fundamental right to be

11   clearly informed of the nature and cause of the charges against him in order to permit adequate

12   preparation of a defense.  See Cole v. Arkansas, 333 U.S. 196, 201 (1948) ("It is as much a

13   violation of due process to send an accused to prison following conviction on a charge on which

14   he was never tried as it would be to convict him upon a charge that was never made."); see also

15   Gautt v. Lewis, 489 F.3d 993, 1002 (9th Cir. 2007).  The Sixth Amendment notice guarantee

16   applies to the States under the Due Process Clause of the Fourteenth Amendment.  See Cole, 333

17   U.S. at 201; Gautt, 489 F.3d at 1003.

18          In some instances, a source other than a charging document can give defendant adequate

19   notice of the charges against him.  See Murtishaw v. Woodford, 255 F.3d 926, 953-54 (9th Cir.

20   2001) (holding that the prosecutor's opening statement, evidence presented at trial, and a jury

21   instruction conference gave the defendant notice of the prosecution's theory); Calderon v. Prunty,

22   59 F.3d 1005, 1009-10 (9th Cir. 1995) (holding that the prosecutor's opening statement and a

23   hearing held after the prosecution's case in chief gave the defendant adequate notice of the

24   prosecution theory); Sheppard v. Rees, 909 F.2d 1234, 1236 n. 2 (9th Cir. 1989) (suggesting that

25   "[a]n accused could be adequately notified of the nature and cause of the accusation by other

26   means - for example, a complaint, an arrest warrant, or a bill of particulars" or "during the course

15

1   of a preliminary hearing"); see also Gautt 489 F.3d at 1009-10 (noting the possibility that a

2   source other than the charging document can give notice to a defendant of the charges against

3   him).

4           This is not a case where Petitioner was not given notice that the prosecutor intended to

5   advance a felony-murder (robbery) theory to support a first-degree murder conviction.  As noted

6   by the California Court of Appeal, Petitioner filed a motion in limine before trial seeking to

7   prevent the prosecutor from advancing a felony-murder (robbery) theory at trial.  Thus, he was

8   clearly on notice that the prosecutor was intending to advance such a theory.  Petitioner is not

9   entitled to federal habeas relief on his lack of notice argument.  Thus, Claim I does not warrant

10  federal habeas relief.

11          B.  Claim II

12          In Claim II, Petitioner asserts that there was insufficient evidence to support a finding that

13  Norteno is a criminal street gang.  The California Court of Appeal analyzed this Claim on direct

14  appeal and stated the following:

15              The jury found true the special circumstance allegation that while
                defendant was an active participant in a criminal street gang, he
16              intentionally killed the victim to further the activities of the
                criminal street gang.  (§ 190.2, subd. (a)(22).)  It found true the
17              allegation that defendant committed the offense for the benefit of a
                criminal street gang.  (§ 186.22, subd. (b)(1).)  The jury also found
18              defendant guilty of violating section 186.22, subdivision (a),
                actively participating in a criminal street gang.  The existence of a
19              criminal street gang is an element of all three allegations.

20              A criminal street gang is defined as, "an ongoing association of
                three or more persons with a common name or common identifying
21              sign or symbol [that] has as one of its primary activities the
                commission of one or more of the criminal acts enumerated in the
22              statute[,] and . . . includes members who either individually or
                collectively have engaged in a 'pattern of criminal gang activity' by
23              committing, attempting to commit, or soliciting *two or more* of the
                enumerated offenses (the so-called 'predicate offenses') during the
24              statutorily defined period.  [Citation.]"  (People v. Gardely (1996)
                14 Cal.4th 605, 617; In re Jose P. (2003) 106 Cal.App.4th 458,
25              466-467.)
                Defendant contends there was insufficient evidence to sustain a
26              finding of the existence of a criminal street gang because the gang

                                            16

to which the prosecution's expert testified was the Norteno gang, and the term "Norteno" is merely the geographical identity of a number of local gangs with similar characteristics, but is not itself an entity.  Defendant's contention is not supported by the evidence.

Defendant relies on People v. Valdez (1997) 58 Cal.App.4th 494 (Valdez), noting that in Valdez the Sixth District Court of Appeal stated, "Norteno and Sureno are not the names of gangs." (Id. at p. 508.)  However, in Valdez, the issue was whether the trial court had abused its discretion in allowing the prosecution's gang expert to testify that the defendant had acted for the benefit of a gang, the defendant arguing the issue was one of fact for the jury.  (Id. at p. 507.)  The pertinent facts were that "a group of individuals from a number of different Norteno cliques or gangs in San Jose came together one day and formed a caravan to attack Surenos." (In re Jose P., supra, 106 Cal.App.4th at p. 467.)  The court stated that if the evidence had been that most or all of the participants in the caravan were from the same Norteno gang, then the jury might have been able to determine the "'for the benefit etc.'" element as easily as an expert.  (Valdez, supra, at p. 508.)  "However," the court stated, "the facts of the case were not so simple.  The participants in the caravan were a diverse group, with affiliations to different gangs.  They united for one day to attack Surenos.  At the time it assembled, the caravan was not a 'criminal street gang' within the meaning of the enhancement allegation.  Moreover, their common identification as Nortenos did not establish them as a street gang, for, as Officer Piscitello testified, Norteno and Sureno are not the names of gangs." (Ibid.)  The court concluded the particular facts of the case were such that the jury could not determine whether a crime had occurred without the assistance of an expert.  (Ibid.)  Even assuming Valdez was correctly decided, a subsequent decision by the Sixth District reiterated that, "Valdez does not hold that there is no criminal street gang called Norteno." (In re Jose P., supra, 106 Cal.App.4th at p. 467.)

Detective Aurich, the prosecution's gang expert, testified there were thousands of documented Norteno gang members in Sacramento.  He testified some of their commonly used symbols are the letter "N," the Roman numeral "IV," "catorce" (Spanish for 14), and the color red.  He testified some of their primary activities are the commission of murder, assault, witness intimidation, car-jacking, robbery, extortion, and dope dealing.  Detective Aurich also testified regarding the facts of two crime reports of offenses committed by Nortenos.  One involved a shooting into a crowd of rival gangsters.  The other involved a Norteno gang member shooting someone at a gas station who was wearing Sureno colors.

Evidence was thus presented, through the prosecution's gang expert, to establish every element of the existence of the Nortenos as a criminal street gang.  Unlike Valdez, there was no expert testimony in this case that Norteno is not the name of a gang, and,

17

1   as the Sixth District Court of Appeal recognized in a later case,
    "the expert testimony in Valdez was evidence in that case, not this
2   one."  (In re Jose P., supra, 106 Cal.App.4th at p. 467.)

3   Detective Aurich testified there were thousands of Norteno gang
    members in the Sacramento area, and 20 to 25 subsets of Nortenos.
4   We reject defendant's assertion that the prosecution had to prove
    precisely which subset was involved in the present case.  No
5   evidence indicated the goals and activities of a particular subset
    were not shared by others.  There was sufficient evidence that
6   Norteno was a criminal street gang, that the murder was related to
    the activity of that gang, and defendant actively participated in that
7   gang.  There is no further requirement that the prosecution prove
    which particular subset was involved here.  As stated in Valdez,
8   supra, 58 Cal.App.4th at pages 506-507, "gangs are not public and
    open organizations or associations like the YMCA or State Bar
9   Association, which have a clearly defined and ascertainable
    membership.  Rather, gangs are more secretive, loosely defined
10  associations of people, whose involvement runs the gamut from
    'wannabes' to leaders.  Moreover, determining whether someone is
11  involved and the level of involvement is not a simple matter and
    requires the accumulation of a wide variety of evidence over time
12  and its evaluation by those familiar with gang arcana in light of
    pertinent criteria."  (Fn. omitted.)  In this case there was testimony
13  that it was not uncommon for members of different gangs to work
    in concert to commit a crime.  In light of the nature of gang
14  structure and the apparent willingness of members to work with
    other gangs to commit crimes, requiring the prosecution to prove
15  the specific subset of a larger gang in which a defendant operated
    would be an impossible, and ultimately meaningless task.

16

17  (Slip Op. at p. 26-31.)

18          The Due Process Clause of the Fourteenth Amendment "protects the accused against

19  conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the

20  crime with which he is charged."  In re Winship, 297 U.S. 358, 364 (1970).  There is sufficient

21  evidence to support a conviction, if, "after viewing the evidence in the light most favorable to the

22  prosecution, any rational trier of fact could have found the essential elements of the crime beyond

23  a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319 (1979).  "[T]he dispositive question

24  under Jackson is 'whether the record evidence could reasonably support a finding of guilt beyond

25  a reasonable doubt.'"  Chein v. Shumsky, 373 F.3d 978, 982 (9th Cir. 2004) (quoting Jackson,

26  443 U.S. at 318).  A petitioner for a federal writ of habeas corpus "faces a heavy burden when

18

1   challenging the sufficiency of the evidence used to obtain a state conviction on federal due

2   process grounds." Juan H. V. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005). In order to grant the

3   writ, the habeas court must find that the decision of the state court reflected an unreasonable

4   application of Jackson and Winship to the facts of the case. See id.

5       A federal habeas court determines sufficiency of the evidence in reference to the

6   substantive elements of the criminal offense as defined by state law. See Jackson, 443 U.S. at

7   324 n. 16; Chein, 373 F.3d at 983. As noted by the California Court of Appeal, the jury

8   specifically found that Petitioner "intentionally killed Walter Adams, or a principal intentionally

9   killed Walter Adams and the defendant aided and abet the killing while being an active

10  participant in a criminal street gang, within the meaning of Penal Code Section 190.2(a)(22)."

11  (Clerk's Tr. at p. 1051.) The jury also specifically found that the "offense was committed by

12  defendant for the benefit of, at the direction of, or in association with a criminal street gang

13  within the meaning of Penal Code section 186.22(b)(1)." (Id. at p. 1053.) Finally, the jury also

14  specifically found Petitioner guilty of violated Section 186.22(a) of the California Penal Code by

15  being an active participant in a criminal street gang. (See id. at p. 1054.)

16      Petitioner argues there was insufficient evidence to support these findings/convictions

17  because Norteno is not a criminal street gang. California Penal Code § 186.22(f) defines a

18  "criminal street gang" as "any ongoing organization, association, or group of three or more

19  persons, whether formal or informal, having one of its primary activities the commission of one

20  or more of the criminal acts enumerated [in subdivision (e) of the statute, the 'predicate

21  offenses'] . . . and whose members individually or collectively engage in or have engaged in a

22  pattern of criminal gang activity." See also People v. Gardeley, 14 Cal.4th 605, 617, 59 Cal.

23  Rptr. 2d 356, 927 P.2d 713 (1996) ("[T]he prosecution must prove that the gang (1) is an

24  ongoing association of three or more persons with a common name or common identifying

25  symbol; (2) has as one of its primary activities the commission of one ore more of the criminal

26  acts enumerated in the statute; and (3) includes members who either individually or collectively

1  have engaged in a 'pattern of criminal gang activity' by committing, attempting to commit, or

2  soliciting *two or more* of the enumerated offenses (the so-called 'predicate offenses') during the

3  statutorily defined period.").  Petitioner argues that the term "Norteno" is a highly amorphous

4  concept that does not constitute a criminal street gang.  (See Pet'r's Pet. at p. 8.)  For the

5  following reasons, the California Court of Appeal's decision was not an objectively unreasonable

6  application of Jackson or Winship such that Petitioner is not entitled to federal habeas relief on

7  this Claim.

8         In this case, the prosecutor called Detective Aurich as a gang expert witness.  As noted by

9  the California Supreme Court, "[t]he subject matter of the culture and habits of criminal street

10 gangs" is permissible subject matter for expert opinion.  See Gardeley, 14 Cal. 4th at 617, 619-

11 20, 59 Cal. Rptr. 2d 356, 927 P.2d 713.  Detective Aurich testified that the Nortenos were an

12 ongoing association of three or more persons who share a common name, common identifying

13 sign or a common similar goal.  (See Reporter's Tr. at p. 1084.)  He further testified that one of

14 the primary activities of the Nortenos is murder, assault, witness intimidation, car-jacking,

15 robbery, extortion and dope dealing.  (See id. at p. 1086.)  Detective Aurich also testified about

16 two predicate offenses that were committed by the Norteno gang.  One involved a Norteno gang

17 member shooting into a crowd of rival gang members.  (See id. at p. 1088-89.)  A second

18 involved a documented Norteno gang member shooting a person believing he was a rival gang

19 member.  (See id.)  Detective Aurich testified that Sisneros, Bejarano and the Petitioner were all

20 members and active participants of Nortenos as well.  (See id. at p. 1104, 1106, 1116-17.)

21 Construing the evidence at trial in the light most favorable to the prosecution, there was

22 sufficient evidence at trial to support a finding that the Nortenos is a criminal street gang.

23 Therefore, Petitioner's claim of a lack of sufficient evidence to support this finding does not

24 merit granting federal habeas relief.  Claim II should therefore be denied.

25        C.  Claim III

26        In Claim III, Petitioner makes several arguments that the prosecutor committed

1  misconduct during the trial.  Petitioner's prosecutorial misconduct arguments fall into three

2  separate categories; specifically:  (1) the prosecutor committed misconduct by asking Petitioner

3  questions about his post-arraignment silence; (2) the prosecutor committed misconduct by

4  referring to polygraphs when referencing Bejarano and Sisneros' plea agreements; and (3) the

5  prosecutor committed misconduct by mischaracterizing evidence during his closing argument.

6  Each of these arguments will be considered in turn.

7          i.  Questions on Defendant's Postarrest silence

8          The California Court of Appeal analyzed this issue on direct appeal and stated the

9  following:

10/11          Defendant argues the prosecutor's repeated questioning about what defendant told others regarding the incident was misconduct.  We shall determine any harm was cured by the court's instruction.

12/13/14/15/16/17          After defendant testified on direct examination that Bejarano had been the shooter and that defendant had been unaware of the true purpose of the test drive, the prosecutor asked defendant on cross-examination if it was fair to say he had never told such a story in the past.  The prosecutor then established that the police had advised defendant of his Miranda rights before questioning him, that defendant knew the interview was being videotaped, and that defendant understood he could stop the interview at any time.  The prosecutor then asked defendant without objection whether he had told the police about the robbery in Willits when he was questioned about Walter Adams's murder.

18/19/20/21          The prosecutor asked if defendant's testimony in front of the jury was the first time he had ever told anyone that the plan was to meet Johnny Boy (Johnny Mitchell).  Defendant objected, and an unreported bench conference was held.  During the bench conference, defense counsel argued the prosecutor's line of questioning violated the attorney-client privilege.  The trial court ordered the prosecutor to preface his questions to exclude the communications between defendant and his counsel.

22/23/24/25/26          When questioning resumed, the prosecutor asked defendant if he understood that he did not have to discuss anything he told his attorney or investigator because it was privileged.  The trial court sustained an objection from defense counsel and another unreported bench conference was held.  Next, the prosecutor instructed defendant to disregard anything he may have told his attorney or investigator, and asked whether, prior to his testimony, he had told anyone else of his involvement in the Willits robbery.

The prosecutor continued to ask about what defendant might have previously told others about the details of the Willits robbery.

The prosecutor then began asking questions about defendant's direct testimony, and whether he had previously revealed certain details.  When two of the prosecutor's questions were not prefaced by an exclusion of defendant's attorney or investigator, defendant replied that he had told certain details to his attorney.  The court asked the attorneys to approach, and the discussion was not reported.  At the unreported bench conference, the court ordered the prosecutor not to ask any questions about what defendant said or did not say to anyone after his initial arraignment.

After the unreported bench conference, the prosecutor prefaced the next question, and several thereafter, with some variant of, "[b]efore you were appointed an attorney, have you ever told anybody . . . ."

Shortly thereafter, the prosecutor started the question, "Prior to your testimony here today in front of this jury . . ." when he was interrupted by the trial court, and a reported conference ensued. The trial court stated that defense counsel had originally asserted that the questions about what defendant may or may not have said at a certain point in time implicated the attorney-client privilege. The court said it agreed with the concern, but had others as well. The court noted it had originally agreed to let the prosecutor ask the defendant what he had told others up to the time he was appointed an attorney.  The court indicated it no longer thought those questions were appropriate, and would give a limiting instruction.  Defendant's counsel then asked for a mistrial on three grounds.  He claimed the questions violated defendant's privilege against self incrimination, that the questions implied defendant and his attorney collaborated to fabricate defendant's testimony on the witness stand, and that the questions implicated attorney-client privilege.

At the request of the defense, and with the prosecutor's stipulation, the court gave a limiting instruction.  The court denied the motion for mistrial, and instructed the jury as follows:

> "Questions have been asked concerning what Mr. Ortega told anyone prior to his testimony today.  Do not infer from these questions and answers that his attorney has told him what to say in his testimony.  [¶]  Also, do not consider as evidence defendant's silence concerning any events underlying the charges, that silence having taken place after his first arraignment or first appearance in court, which was his arraignment on November 5th, 2002.  [¶]  When the defendant was arraigned at his first appearance in court, he was informed by the

22

> Court that he had a constitutional right not to say anything about the events underlying the charges. And his silence was an invocation of those rights. [¶] Also, at his first appearance in court, the defendant was advised by counsel not to say anything to anyone concerning the events underlying the charges. Therefore, you must not draw any inference from his silence after his arraignment. [¶] Further, you must not discuss it, nor permit it to enter into your deliberations in any way."

After the verdict, defendant moved for a new trial on the basis of prosecutorial misconduct. The trial court denied the motion, stating the curative instruction given remedied any violation.

Defendant argues the prosecutor committed <u>Doyle [v. Ohio</u>, 426 U.S. 610 (1976)] error in cross-examining him about his postarrest silence. The defendants in <u>Doyle</u> made no postarrest statement after being given their <u>Miranda</u> warnings. At trial, they contended for the first time that they had been framed by a government informant. (<u>Doyle</u>, <u>supra</u>, 426 U.S. at pp. 612-613 [49 L.Ed.2d at p. 95].) The prosecutor attempted to impeach their testimony by asking why they had not told their story of a frame-up before trial. (<u>Id.</u> at pp. 613-614 [at pp. 95-96].) The United States Supreme Court reversed the convictions, holding that <u>Miranda</u> prohibited such questions as a means of impeachment. (<u>Id.</u> at p. 617 [at p. 97].)

Subsequently, the United States Supreme Court clarified that, "<u>Doyle</u> does not apply to cross-examination that merely inquires into prior inconsistent statements. Such questioning makes no unfair use of silence because a defendant who voluntarily speaks after receiving <u>Miranda</u> warnings has not been induced to remain silent." (<u>Anderson v. Charles</u> (1980) 447 U.S. 404, 408 [65 L.Ed.2d 222, 226].)

In <u>People v. Belmontes</u> (1988) 45 Cal.3d 744, the California Supreme Court indicated that while it is permissible to question a defendant about inconsistencies between extrajudicial statements and trial testimony, questions that elicit a defendant's testimony that he made no statements about the crime after being appointed an attorney, but before trial, run afoul of <u>Doyle</u>. (<u>Id.</u> at pp. 785-86.) <u>Belmontes</u> held that the questions in that case had the potential to ripen into <u>Doyle</u> error because, although they may have been meant to point out the differences between the defendant's extrajudicial statements and his trial testimony, they could have been interpreted to highlight the defendant's silence between his last jailhouse statement (after which he was appointed an attorney) and trial. (<u>Id.</u> at p. 786.) The <u>Belmontes</u> court held the questions in the case before it did not ripen into <u>Doyle</u> error because of the trial court's

admonishment.  (Id. at pp. 786-787.)

In this case, most of the prosecutor's questions regarding what defendant did or did not say were also an attempt to highlight the difference between defendant's statement to police and his trial testimony.  The prosecutor asked numerous questions about defendant's trial version of certain details of the crime, and whether defendant had previously told anyone the trial version.  After asking numerous questions in this vain, the prosecutor emphasized by his questions that defendant had spent three hours talking to the police about "each and every one of these things," and yet he chose to tell a story he claimed at trial was a lie.  As in Belmontes, the prosecutor's questions here could have been interpreted to highlight defendant's silence after he was appointed an attorney, instead of the differences between defendant's two versions of the crime.  For this reason, the prosecutor's emphasis on whether defendant had ever made certain statements before trial, rather than on the discrepancies between defendant's pretrial and trial statements was ill-advised.  However, also as in Belmontes, the questions did not ripen into Doyle error because the trial court admonished the jury not to draw any inference from defendant's silence after he was appointed an attorney.

There was no Doyle error with regard to the questions the prosecutor asked about the Willits robbery.  The reasoning of Doyle is that a person arrested for a crime has the right to remain silent, and that after being informed of that right, he should not be penalized for exercising it.  (Doyle, supra, 426 U.S. at p. 619 [49 L.Ed.2d at p. 98].)  Defendant was not arrested for the Willits robbery, nor was he charged with the Willits robbery.  By emphasizing his silence on the Willits robbery, the prosecutor was not punishing defendant for exercising his Miranda rights in this case.

We also find no prejudicial violation of defendant's attorney-client privilege.  After defense counsel objected to the prosecutor's questions on this ground, the prosecutor told defendant anything he may have told his attorney or investigator was privileged and that he did not have to discuss it.  Even though every question may not have been prefaced with that disclaimer, it was clear from the context that the prosecutor was not attempting to elicit attorney-client confidences.

In any event, we conclude any error as a result of the prosecutor's questions was not prejudicial.  Error in this circumstance is prejudicial if the evidence against defendant is less than overwhelming and if the improper questioning touched a live nerve in the defense.  (People v. Lindsey (1988) 205 Cal.App.3d 112, 117.)  However, the prejudicial impact may be ameliorated by a strong curative instruction.  (People v. Galloway (1979) 100 Cal.App.3d 551, 560.)

24

> This case differs from People v. Galloway, supra, because here there was a strong curative instruction, the evidence of guilt was overwhelming, and the prosecutor did not emphasize defendant's silence in closing argument so as to touch a "live nerve." The evidence was overwhelming because no less than three people gave statements naming defendant as the shooter: Bejarano, Sisneros, and defendant himself. These stories were completely consistent with the physical evidence. Defendant's testimony that he did not shoot the victim was not his sole defense, and the prosecutor did not bring up defendant's silence in his closing argument. The prosecutor could legitimately emphasize defendant's prior statement, the inconsistencies, and the likelihood that the trial testimony was the false testimony. Finally, the trial court gave a strong curative instruction, and we must presume the jury understood and followed this instruction. (People v. Cline (1998) 60 Cal.App.4th 1327, 1336.) We conclude that had the prosecutor phrased his questions so as to emphasize defendant's changed story rather than defendant's silence, it would have had no effect on the verdict. Any error was therefore harmless.

(Slip Op. at p. 33-41.)

A criminal defendant's due process rights are violated if prosecutorial misconduct renders a trial "fundamentally unfair." Drayden v. White, 232 F.3d 704, 713 (9th Cir. 2000) (citing Darden v. Wainright, 477 U.S. 168, 183 (1986)). A habeas petition will be granted for prosecutorial misconduct only when the misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden, 477 U.S. at 181 (internal quotation marks and citation omitted). A determination that the prosecutor's questioning was improper is insufficient in and of itself to warrant reversal. See Ortiz v. Stewart, 149 F.3d 923, 934 (9th Cir. 1998). Further, isolated comments by a prosecutor may be cured by jury instructions. See Sassounian v. Roe, 230 F.3d 1097, 1106-07 (9th Cir. 2000); see also Hall v. Whitley, 935 F.2d 164, 165-66 (9th Cir. 1991) ("Put in proper context, the comments were isolated moments in a three day trial.") A claim of prosecutorial misconduct is analyzed under the prejudice standard set forth in Brecht, 507 U.S. at 638 n. 9. See Karis v. Calderon, 283 F.3d 1117, 1128 (stating that a claim of prosecutorial misconduct is analyzed under the standard set forth in Brecht). Specifically, the inquiry is whether the prosecutorial misconduct had a substantial and injurious effect on the jury's verdict. See Johnson v. Sublett, 63 F.3d 926, 930

1  (9th Cir. 1995) (finding no prejudice from prosecutorial misconduct because it could not have

2  had a substantial impact on the verdict under Brecht).

3        A prosecutor may not impeach a defendant's testimony with his silence after he has been

4  advised of and invoked his right to remain silent under Miranda v. Arizona, 384 U.S. 436, 444

5  (1966). See Doyle, 426 U.S. at 611. The Doyle rule is based on the assurance provided in the

6  Miranda warnings that the exercise of a right of silence will not be penalized. See Wainwright v.

7  Greenfield, 474 U.S. 284, 295 (1986). However, "Doyle does not apply to cross-examination

8  that merely inquires into prior inconsistent statements. Such questioning makes no unfair use of

9  silence because a defendant who voluntarily speaks after receiving Miranda warnings has not

10 been induced to remain silent." Anderson v. Charles, 447 U.S. 404, 408 (1980). Additionally,

11 there is not a Doyle violation if the trial court promptly sustains a timely objection to the question

12 concerning post-arrest silence, instructs the jury to disregard the question, and provides a curative

13 jury instruction. See Greer v. Miller, 483 U.S. 756, 765-67 (1987).

14       A challenged or offering statement must also be evaluated in the context of the entire

15 trial, as well as the context in which it was made. See Boyde v. California, 494 U.S. 370, 384-85

16 (1990). Some factors to consider in determining the prejudicial effect of a prosecutor's

17 misconduct include: (1) whether a curative instruction was issued, see Greer v. Miller, 483 U.S.

18 756, 766 n.8 (1987); (2) the weight of evidence of guilt, compare United States v. Young, 470

19 U.S. 1, 19 (1985) (finding "overwhelming evidence" of guilt), with United States v. Schuler, 813

20 F.2d 978, 982 (9th Cir. 1987) (requiring new trial after prosecutor referred to defendant's

21 courtroom demeanor, in light of prior hung jury and lack of curative instruction); (3) whether the

22 misconduct was isolated or part of an ongoing pattern, see Lincoln v. Sunn, 807 F.2d 805, 809

23 (9th Cir. 1987); (4) whether the misconduct relates to a critical part of the case, see Giglio v.

24 United States, 405 U.S. 150, 154 (1972); and (5) whether the prosecutor's comment misstates or

25 manipulates the evidence. See Darden, 477 U.S. at 181-82.

26       In this case, Petitioner argues that the prosecutor's inquiry into his silence violated Doyle

as well as infringed on his attorney-client communications.  For the following reasons, this argument does not merit federal habeas relief.  First, as stated in <u>Greer</u> an important factor to examine is whether the trial judge instructed the jury to disregard the prosecutor's questioning with regard to a defendant's silence as well as whether the trial judge issued a curative instruction.  <u>See</u> 483 U.S. at 765-67.  That was done in this case.  As outlined by the California Court of Appeal in its decision, the trial judge instructed the jury that they should not infer that his attorney told him what to say in his testimony and that they must not draw any inference from Petitioner's silence.  (<u>See</u> Reporter's Tr. at p. 1539-40.)  The jury is presumed to have followed these instructions.  <u>See</u> <u>Weeks v. Angelone</u>, 528 U.S. 225, 234 (2000).

Additionally, it is important to reiterate the evidence against Petitioner.  For example, the evidence against the Petitioner in this case included the testimony of Bejarano who testified that Petitioner shot Adams in the car.  (<u>See</u> Reporter's Tr. at p. 924.)  Sisneros also testified at trial Bejarano, Petitioner and himself discussed that the purpose of the test-drive of the Explorer was to scare Adams by threatening him and restraining him with a rope.  (<u>See</u> <u>id.</u> at p. 1688.)  Sisneros also testified that after the shooting, the men discussed the shooting whereby Petitioner was indicated as the shooter.  (<u>See</u> <u>id.</u> at p. 1708.).  It is also worth noting that Petitioner initially took responsibility for the shooting to police before changing his theory of what transpired during his trial testimony.  (<u>See</u> <u>id.</u> at p. 1471.)  This could have affected how credible the jury viewed Petitioner's testimony.  As stated by the California Court of Appeal, three witnesses (including the Petitioner himself at one time), stated that Petitioner was the shooter.  Thus, for the foregoing reasons, Petitioner is not entitled to relief on this argument as the prosecutor's statement did not make Petitioner's trial fundamentally unfair under this argument.

   ii.  Reference to Polygraphs of Bejarano and Sisneros During Prosecutor's Rebuttal Closing Argument

The California Court of Appeal also analyzed this issue on direct appeal and stated the following:

The plea agreements for Bejarano and Sisneros were admitted into evidence without objection, and defense counsel cross-examined Bejarano and Sisneros extensively regarding the agreements.  In closing argument, defense counsel argued Bejarano and Sisneros knew what information the prosecutor wanted and acted in their own self interest by giving the prosecution the information it wanted.  Defense counsel told the jury to be skeptical of the contracts and to "scrutinize" them.

In rebuttal, the prosecutor argued the plea deals were not actually that good for Bejarano and Sisneros, and that the plea agreements meant that both of them would be serving more time than if they had been convicted of second degree murder, and almost as much time as if they had been convicted of first degree murder.  The prosecutor went on to explain that by entering into the plea agreements they did not have the benefit of a determination, "based upon judges, courtrooms, anything else like this.  The second page of both of these contracts explains that they have to have a polygraph, a polygraph examination, that would be submitted at any time.  So we don't have to come in here.  We don't have to have a jury determine this.  We don't have to hear closing arguments.  If they fail a polygraph, all bets are off.  They return to their original positions, face the rest of their lives in prison."

At the next court recess, defense counsel informed the court:  "I know there's language about polygraphs in the contracts.  I certainly don't have any objection to it being referenced, however, the insinuation to the jury that polygraphs were done in this case, obviously that would create the inference that if the polygraphs passed [sic] would certainly be absolutely false."  The prosecutor and the court assured defense counsel that no such insinuation had been made, and defense counsel raised no objection.

Defendant claims the prosecutor's reference to polygraph tests violated Evidence Code section 351.1 and constituted misconduct. We disagree.

Evidence Code section 351.1 subdivision (a) states:

> "Notwithstanding any other provision of law, the results of a polygraph examination, the opinion of polygraph examiner, or any reference to an offer to take, failure to take, or taking of a polygraph examination, shall not be admitted into evidence in any criminal proceeding, including pretrial and post conviction motions and hearings, or in any trial or hearing of a juvenile for a criminal offense, whether heard in juvenile or adult court, unless all parties stipulate to the admission of such results."

1
2
3
4
5
6

     This section prohibits references to polygraphs from being admitted into evidence.  Of course, the arguments of counsel are not evidence, so any mention of a polygraph in the prosecutor's closing argument did not violate Evidence Code section 351.1.  Although defendant does not raise the argument, the admission of the plea agreements also did not violate the section.  The plea agreements did not contain the results of a polygraph examination, the opinion of a polygraph examiner, or any offer to take or refusal to take a polygraph.  The agreements merely stated that a polygraph could be required at any time.

7   (Slip Op. at p. 41-43.)

8         References to the results of a polygraph examination, an offer to take a polygraph

9   examination, or a refusal to take such a test are disfavored an constitute inadmissible evidence in

10  a criminal proceeding, absent a stipulation by counsel.  See Cal. Evid. Code § 351.1.  At the

11  outset, it is worth noting that defense counsel did not object to the admission of Bejarano and

12  Sisneros' plea agreements into evidence.  Petitioner argues that the prosecutor's reference in

13  closing argument to Bejarano and Sisneros's plea agreement and the provision that required them

14  to have a polygraph examination constituted prosecutorial misconduct.

15        "A writ of habeas corpus is available under 28 U.S.C. § 2254(a) only on the basis of some

16  transgression of federal law binding on the state courts.  It is unavailable to alleged error in the

17  interpretation or application of state law.  See Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir.

18  1985).  Generally speaking, the admission of polygraph evidence does not violate the

19  Constitution.  See id. at 1085-86; Carrillo v. Kramer, Civ. No. 07-1324, 2010 WL 129675, at *8

20  (C.D. Cal. Jan. 8, 2010); Walker v. Marshall, Civ. No. 95-20390, 1996 WL 130821, at *2 (N.D.

21  Cal. Mar. 11, 1996), aff'd by, No. 97-17300, 1999 WL 50852 (9th Cir. Feb. 3, 1999).  Thus, it is

22  solely an issue of state law.  See, e.g., Cacoperdo v. Demosthenes, 37 F.3d 504, 510 (9th Cir.

23  1994).  A court does not review issues of state law in federal habeas proceedings.  See Estelle,

24  502 U.S. at 68.

25        Additionally, as previously noted, the prosecutor's arguments are not evidence and the

26  jury was specifically admonished by the trial judge in his instructions that the attorney's

statements during trial were not evidence to be considered by them.  First, the jury is presumed to

have followed this instruction.  See Weeks, 528 U.S. at 234.  Second, as noted by the California

Court of Appeal, the prosecutor did not state any details about the polygraph tests or give any

results.  See Cacoperdo, 37 F.3d at 510 ("After reviewing the record, we are satisfied that the

reference to the polygraph examinations did not violate Cacoperdo's due process rights.  The

record shows that the witness did not discuss the results of or give any details about the

examinations he only mentioned inadvertently that they had been given.  In addition, each child

testified at trial and was subjected to cross-examination, allowing the jurors to make their own

credibility determinations."); Cardillo, 2010 WL 129675, at *8 (stating that even if the issue of

polygraph testimony was properly before the court, Petitioner failed to show that it made his trial

fundamentally unfair where the witness did not testify about the details of the polygraph

examination or the results).  Petitioner has not shown that his trial was fundamentally unfair by

the prosecutor's statement in closing argument which referenced the polygraph test provision of

the plea agreement.

    iii.  Prosecutor's Purported Mischaracterization of Evidence During Closing
          Argument

        Finally, Petitioner asserts that the prosecutor mischaracterized facts during his closing

argument that went to critical determinations in the case; specifically Petitioner argues

that: "[t]he prosecutor mischaracterized the evidence when he stated that petitioner personally

discharged the gun because he knew the number of shots which were fired and with the echo in

the car it was impossible for anyone to hear the number, whether it was three or ten or whatever.

There was no evidence to support that statement."  (Pet'r's Pet. at p. 9.)  The California Court of

Appeal analyzed this issue on direct appeal and stated the following:

        During closing argument the prosecutor, referring to defendant's
        statement to the police, made the following argument to the jury:

            "You saw just on Friday the manner in which the
            police officers asked him [the caliber o the weapon
            used].  There was no suggestion [in the question

that would have prompted the correct answer].  He
knew the caliber, not because he read the little shell
casings that were there in the car.  He knew the
caliber that was used because he is the one that had
the gun.  He also knew the number of shots fired
because he's the one that fired the gun.  When you
have that loud number of shots like Duane Lovaas
[defendant's expert witness] is describing in a small
vehicle, when you have this type of echo that is
going off, it's impossible for anyone to tell the
number of shots between three and ten or whatever,
especially going off in . . . [an objection was
interposed] when it's going off in rapid succession
over a brief amount of time.  He knows how many
shots are in there because – he knows how many
shots were in the gun because he loaded the gun,
because he was the person who, in fact, pulled the
trigger."

Defendant argues that since Lovaas did not testify it was
impossible to tell the number of gunshots going off, it was
misconduct for the prosecutor to argue such a fact.

While a prosecutor may not mischaracterize the evidence in his or
her closing argument, fair comment on the evidence is allowed.
(People v. Harrison (2005) 35 Cal.4th 208, 244.)  Fair comment
includes reasonable deductions or inferences drawn from the
evidence.  (Ibid.)  In this case, Lovaas testified the victim was shot
six times from the same gun, that the noise would have been very
loud, especially since it was in a closed vehicle, that the bullet
wounds were consistent with the victim being in the same position
for all six shots, and that the type of gun used would have made it
possible to fire all six shots in a matter of seconds.  The
prosecution's expert also testified the victim's wounds were
consistent with the shots having occurred very close in time.  It was
reasonable to infer from this evidence, that a person hearing the
shots would not necessarily know exactly how many times the
victim was shot, and that the only reason defendant knew how
many times the victim was shot was because he was the shooter.
The argument was fair comment on the evidence, not a
mischaracterization of the evidence.

(Slip Op. at p. 43-45.)

With respect to improper prosecutorial comments during a closing argument, the law is

settled that under this due process standard, "[c]ounsel are given latitude in the presentation of

their closing arguments, and the courts must allow the prosecution to strike hard blows based on

the evidence presented and all reasonable inferences therefrom."  Ceja v. Stewart, 97 F.3d 1246,

1253-54 (9th Cir. 1996) (internal quotation marks omitted).  A reviewing court should consider a
prosecutor's allegedly improper statements in light of the realistic nature of trial closing
arguments.  "Because 'improvisation frequently results in syntax left imperfect and meaning less
than crystal clear,' 'a court should not lightly infer that a prosecutor intends an ambiguous
remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation,
will draw that meaning from the plethora of less damaging interpretations.'"  Williams v. Borg,
139 F.3d 737, 744 (9th Cir. 1998) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 647
(1974)).  A challenged or offering statement must also be evaluated in the context of the entire
trial, as well as the context in which it was made.  See Boyde v. California, 494 U.S. 370, 384-85
(1990).  For the reasons expressed by the California Court of Appeal in its decision, the
prosecutor's statement did not constitute a due process violation because it was a permitted
inference from the evidence.  Additionally, the jury was specifically admonished that any
statements made from the attorneys during trial was not evidence.  (See Reporter's Tr. at p.
1959.)  The jury is presumed to have followed this instruction.  Any alleged impropriety by the
prosecutor during his closing argument did not rise to the level of a due process violation for
prosecutorial misconduct on this argument.

For the foregoing reasons, Petitioner is not entitled to any of his prosecutorial misconduct
arguments as stated within Claim III.

D.  Claim IV

In Claim IV, Petitioner argues that the trial court erred in failing to exclude evidence of
other uncharged crimes.  Specifically, Petitioner argues that the trial court's introduction of the
Willits robbery and a drive-by shooting in Stockton violated Petitioner's due process and equal
protection rights.  He argues that "neither uncharged crime had any factual resemblance that
would negate mistake here as to the killing."  (Pet'r's Pet. at p. 10.)  The California Court of
Appeal analyzed this issue on direct appeal and stated the following:

Defendant argues the trial court erred in denying his motion to

32

exclude evidence of other crimes.  Specifically, he objects to the introduction of the Willits robbery and of a drive-by shooting in Stockton.  [FN 9]  Defendant made a pretrial motion pursuant to Evidence Code section 1101, subdivision (a) to exclude this evidence, arguing it had no relevance and was prejudicial.

[FN 9]  Bejarano testified that when they were in Stockton on the day of the murder and about an hour before the murder, defendant and Sisneros were talking about another shooting they did in Stockton.  They said defendant, who was inside Sisneros's vehicle at the time, shot a man who was sitting in his car.

In denying the motion to exclude evidence of the two incidents, the trial court held they were relevant to a "pattern of criminal gang activity" which the prosecution was required to prove to obtain a conviction for violation of section 182.2, subdivision (a), participation in a criminal street gang.  The trial court also found the evidence was admissible under Evidence Code section 1101, subdivision (b) because it was relevant to show motive, lack of accident, and aiding and abetting.  Evidence Code section 1101 states in relevant part that evidence of a person's character, including specific instances of conduct, is inadmissible to prove that person's conduct on a specified occasion, unless the evidence is relevant to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Two of the disputed issues at trial were whether the incident was gang-related and whether defendant was the shooter.  Defendant claimed at trial he thought the test drive of the victim's vehicle was legitimate, and he had no idea there was a plan to harm the victim.  He also claimed he hung out with gang members, but he had never done any crimes for the gang.  Both of the prior incidents at issue were relevant to show motive, knowledge, and absence of mistake or accident.  They showed defendant had committed prior gang-related crimes with the two other gang members involved in the instant case, and that defendant had been armed in each instance.  Together with the testimony of the gang expert that gang crimes are often committed to harm rivals and to make money, the prior incidents tended to show defendant had those motives in the past gang crimes, and likely had those motives in this crime.  The prior incidents also tended to show defendant was an active participant in gang crimes, making it unlikely his involvement in Walter Adams's murder was accidental.

The evidence was properly admitted pursuant to Evidence Code section 1101, subdivision (b).  Nevertheless, defendant contends the trial court abused its discretion in allowing the evidence because it was unduly prejudicial, uncorroborated, cumulative, devoid of detail, and dissimilar to the crime at issue.  We will reverse the trial court's exercise of discretion only if the ruling was "'arbitrary, whimsical, or capricious as a matter of law.  [Citation.]'"  (<u>People v. Branch</u> (2001) 91 Cal.App.4th 274,

282.)

Evidence Code section 352 provides that the trial court may, in its discretion, exclude relevant evidence if its probative value is substantially outweighed by the likelihood that it will necessitate undue consumption of time or create a substantial danger of undue prejudice, confuse the issues, or mislead the jury.  The factors to be considered in determining whether to exclude uncharged offenses sought to be admitted under Evidence Code 1101, subdivision (b) are: "(1) the inflammatory nature of the uncharged conduct; (2) the possibility of confusion of issues; (3) remoteness in time of the uncharged offenses; and (4) the amount of time involved in introducing and refuting the evidence of uncharged offenses." (People v. Branch, supra, 91 Cal.App.4th at p. 282.)

In this case neither of the prior incidents was as inflammatory as the charged offense of murder, both prior incidents appeared to have been fairly recent, [FN 10] there was no possibility of confusion of the issues, and the amount of time spent on the prior incidents was minor in comparison to the voluminous testimony presented in this trial.
[FN 10]  The Willits incident occurred in October 2002.  Bejarano testified he thought the prior Stockton shooting had occurred within the year.

Defendant argues the trial court erred in admitting Bejarano's testimony regarding the prior drive-by shooting in Stockton because it was based on the uncorroborated evidence of an accomplice.  Although Penal Code section 1111 requires that accomplice testimony be corroborated to support a conviction, the statute relates to the sufficiency, not the admissibility of the evidence.  (People v. Riel (2000) 22 Cal.4th 1153, 1190.)

To the extent defendant argues the trial court erred in admitting Bejarano's testimony regarding the prior Stockton shooting because there was no proof of the corpus delicti of the shooting, any such claim is forfeited for failure to object on that ground at trial.  (People v. Martinez (1996) 51 Cal.App.4th 537, 544.)  Moreover, the corpus delicti rule has never been applied to other crimes evidence.  (Id. at p. 545.)

Defendant also argues it violated his right to due process to admit evidence that was offered only to prove his propensity to commit crimes.  We have determined the evidence was properly admitted for reasons other than to establish a propensity to commit crimes, thus there was no due process violation.

(Slip Op. at p. 46-49.)

A state court's evidentiary ruling is not subject to federal habeas review unless the ruling

34

1   violates federal law, either by infringing a specific constitutional provision or by depriving the

2   defendant of the fundamentally fair trial guaranteed by due process.  See Pulley v. Harris, 465

3   U.S. 37, 41 (1984).  The due process inquiry in federal habeas review is whether the admission of

4   evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair.

5   See Romano v. Oklahoma, 512 U.S. 1, 12-13 (1994).  "A habeas petitioner bears a heavy burden

6   in showing a due process violation based on an evidentiary decision."  Boyde v. Brown, 404 F.3d

7   1159, 1172 (9th Cir. 2005).  The United States Supreme Court has "defined the category of

8   infractions that violate 'fundamental fairness' very narrowly."  Dowling v. United States, 493

9   U.S. 342, 352 (1990).  Only if there are no permissible inferences that the jury may draw from

10   the evidence can its admission violate due process.  See Jammal v. Van de Kamp, 926 F.2d 918,

11   920 (9th Cir. 1991).

12        As noted by the California Court of Appeal, disputed issues at trial included whether the

13   incident was gang-related and whether the defendant was the shooter.  Thus, the prior uncharged

14   crimes testimony contained permissible inferences that the jury could draw.  For example, as

15   stated by the state court, the prior incidents showed that Petitioner had committed prior gang-

16   related crimes with the other two gang members involved in this case and that Petitioner had

17   been armed on those occasions.  For these reasons, the trial court's decision to allow this

18   evidence did not violate Petitioner's due process rights as it was not arbitrary or so prejudicial

19   that it rendered the trial fundamentally unfair.

20        Assuming *arguendo* that the trial court erred in permitting this testimony of Petitioner's

21   prior uncharged crimes, Petitioner would also not be entitled to federal habeas relief on this

22   Claim because the admission of this evidence did not have a "substantial and injurious effect on

23   the jury's verdict."  Plascencia v. Alameida, 467 F.3d 1190, 1203 (9th Cir. 2006) (applying

24   Brecht harmless error analysis to claim that the admission of evidence was improper).  Without

25   this evidence, the jury had sufficient evidence to convict the Petitioner of the charged offense.

26   For example, as stated in supra Part IV.C.i., evidence was presented at trial that Petitioner was

1   the shooter through Bejarano and Sisneros' testimony.  Additionally, the gang expert testified

2   regarding prior crimes committed by the Nortenos to satisfy that element of the criminal street

3   gang definition.

4          Petitioner also alludes to the fact that his equal protection rights were violated by the

5   introduction of this evidence at trial.[2]  The Fourteenth Amendment's Equal Protection Clause "is

6   essentially a direction that all persons similarly situated should be treated alike." Cleburne v.

7   Cleburne Living Ctr., 473 U.S. 432, 439 (1985).  Petitioner can establish an equal protection

8   claim by showing that he was intentionally discriminated against based on his membership in a

9   protected class, see Lee v. City of Los Angeles, 250 F.3d 668, 686 (9th Cir. 2001), or that

10  similarly situated individuals were treated differently without a rational basis for the difference in

11  treatment.  See Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (per curiam).  To

12  state an equal protection claim under this second theory, Petitioner must allege that:  (1) he was

13  intentionally treated differently from other similarly situated; and (2) there is no rational basis for

14  the difference in treatment.  See Engquist v. Oregon Dep't of Agric., 553 U.S. 591, 601 (2008).

15  In this case, Petitioner fails to show that he was intentionally treated differently than others

16  similarly situated and he does not show that he was intentionally discriminated based on his

17  membership in a protected class.  Thus, Claim IV does not merit federal habeas relief on equal

18  protection grounds as well.

19         The denial of this Claim by the California Court of Appeal was not an unreasonable

20  application of clearly established federal law.  Accordingly, the Claim should be denied.

21         E.  Claim V

22         In Claim V, Petitioner argues that he was denied his due process and equal protection

23  rights when the trial court permitted questioning of whether one of Petitioner's tattoos showed a

24  

25          [2] While it appears that Petitioner may not have exhausted this equal protection argument,
    a federal habeas court can deny an unexhausted claim so long as it is deemed not "colorable."
26  See Cassett v. Stewart, 406 F.3d 614, 624 (9th Cir. 2005).

propensity for violence.  In his answer, Respondent argues that this claim is procedurally

defaulted.  Alternatively, Respondent asserts that this Claim can also be denied on the merits.

The California Court of Appeal discussed this claim in its opinion on direct appeal and stated the

following:

> Defendant argues the trial court erred in not sustaining an objection
> to a prosecution question asking whether one of defendant's tattoos
> showed a propensity for violence.  We shall conclude that the issue
> was not preserved for appeal because defense counsel was not
> specific as to the ground for the objection, and that any error in
> failing to sustain the objection was harmless because no improper
> propensity evidence was presented.
>
> Evidence Code section 353 precludes reversal of a judgment
> because of the erroneous admission of evidence unless there was a
> timely objection making clear the specific ground for the objection.
> Defendant's trial counsel did not specify any ground for objecting,
> thus the issue was not preserved for appeal.  (People v. Partida
> (2005) 37 Cal.4th 428, 431.)
>
> In any case, no objectionable propensity evidence was presented.
> The objection occurred when the prosecutor was questioning
> Aurich, the gang expert, about defendant's tattoos.  The prosecutor
> asked whether a certain tattoo indicated gang involvement.  The
> expert responded the tattoo was more an indication of gang
> mentality or characteristic.  The prosecutor then asked: "Now when
> you have this tattoo . . . this creature with a hat, maybe it's a clown
> with a hat, and the two firearms, both double barreled or two
> firearms, is that bragging about your propensity for violence?"  The
> trial court overruled defense counsel's objection, and the witness
> replied, "I think it promotes what the mentality of that person in
> that the lifestyle he chooses by showing that his use of guns – are
> in favor of guns is not – is well within his realm.  Again, these
> tattoos are a way of sort gangsters because they are more visible.
> Intimidating people and intimidating or projecting the sense of
> status by tattooing."
>
> Aurich then testified that the five-pointed star in the tattoo was a
> symbol for the Norteno gang.  Based on defendant's tattoos, as
> well as other factors, Aurich opined that defendant was an active
> participant in the gang.  Evidence of the significance of defendant's
> tattoos was relevant to show his active participation.  Aurich did
> not testify that the tattoo showed a propensity to violence but that it
> was a visible signal of gang membership designed to intimidate
> and project a sense of status in the gang.  Such evidence of gang
> culture was admissible.  (People v. Ferraez (2003) 112 Cal.App.4th
> 925, 930.)

37

1   (Slip Op. at p. 50-51.)

2              i.  Procedural Default

3        A state court's refusal to hear the merits of a claim because of the petitioner's failure to

4   follow a state procedural rule is considered a denial of relief on an independent and adequate

5   state ground.  See Harris v. Reed, 489 U.S. 255, 260-61 (1989).  The state rule for these purposes

6   is only "adequate" if it is "firmly established and regularly followed."  Id. (citing Ford v.

7   Georgia, 498 U.S. 411, 424 (1991); see also Bennett v. Mueller, 322 F.3d 573, 583 (9th Cir.

8   2003) ("[t]o be deemed adequate, the state law ground for decision must be well-established and

9   consistently applied.").  The state rule must also be "independent" in that it is not "interwoven

10  with the federal law."  Park v. California, 202 F.3d 1146, 1152 (9th Cir. 2000) (citing Michigan

11  v. Long, 463 U.S. 1032, 1040-41 (1983)).  Furthermore, procedural default can only block a

12  claim in federal court if the state court, "clearly and expressly states that its judgment rests on a

13  state procedural bar."  Harris, 489 U.S. at 263.  This means that the state court must have

14  specifically stated that it was denying relief on a procedural ground.  See Ylst v. Nunnemaker,

15  501 U.S. 797, 803 (1991); Acosta-Huerta v. Estelle, 7 F.3d 139, 142 (9th Cir. 1993).

16       Pursuant to Section 353 of California's Evidence Code, also known as the

17  contemporaneous objection rule, "evidence is admissible unless there is an objection, the grounds

18  for the objection are clearly expressed, and the objection is made the time the evidence is

19  introduced."  Melendez v. Pliler, 288 F.3d 1120, 1125 (9th Cir. 2002).  The Ninth Circuit has

20  held that California's contemporaneous objection rule is an adequate and independent state

21  procedural rule when properly invoked by the state courts.  See Rich v. Calderon, 187 F.3d 1064,

22  1066 (9th Cir. 1999).

23       When the state court discusses a procedural default but also reaches the merits of a claim,

24  a denial of the claim cannot necessarily be said to have relied on the on the procedural default.

25  See Thomas v. Hubbard, 273 F.3d 1164, 1176 (9th Cir. 2001), overruled on other grounds,

26  Payton v. Woodford, 346 F.3d 1204 (9th Cir. 2003) (citing Harris, 489 U.S. at 263); see also

                                            38

1   Panther v. Hames, 991 F.2d 576, 580 (9th Cir. 1993).  As the Ninth Circuit stated in Panther,

2   "because the Alaska Court of Appeals considered Panther's claims on the merits . . . so can we."

3   991 F.2d at 580.  In Thomas, the state court discussed the issue of procedural default but then

4   went on to deny the claim because any error was harmless.  See 2743 F.3d at 1176.  The Ninth

5   Circuit held: "[i]n so doing, the [state] court left the resolution of the procedural default issue

6   uncertain rather than making a clear and express statement that its decision was based on

7   procedural default."  Id.

8          In this case, the California Court of Appeal discussed the procedural default issue but also

9   denied the claim on the merits in ultimately determining that "no objectionable propensity

10  evidence was presented."  (Slip Op. at p. 50.)  Under these circumstances, the procedural default

11  will not operate to bar federal review of this Claim on the merits.

12         Furthermore, it is worth noting that the California Supreme Court summarily denied

13  Petitioner's petition for review.  The United States Supreme Court has stated that "[s]tate

14  procedural bars may expire because of later actions by state courts.  If the last state court to be

15  presented with a particular federal claim reaches the merits, it removes any bar to federal court

16  review that might otherwise have been available."  Ylst, 501 U.S. at 801.  Recently, the United

17  States Supreme Court reiterated that a summary denial constitutes a decision on the merits.

18  Cf. Harrington v. Richter, 131 S.Ct. 770, 784-85 (2011) (citing Harris, 489 U.S. at 265).  Thus,

19  because of the summary denial by the California Supreme Court, the merits of Claim V should be

20  addressed as opposed to relying on Respondent's procedural default argument.

21             ii.  Merits

22         Petitioner argues that the trial court improperly allowed the evidence of his tattoos at trial

23  because it impermissibly asked for whether Petitioner had a propensity for violence.  Petitioner

24  argues that this violated his due process rights.  However, Petitioner does not demonstrate how

25  the state court's allowance of this question was contrary to, or involved an unreasonable

26  application of clearly established Federal law, as determined by the Supreme Court of the United

1   States." 28 U.S.C. § 2254(d)(1).  The Supreme Court has yet to rule on whether propensity

2   evidence admitted in a criminal trial pursuant to state law violates the Due Process Clause.  See,

3   e.g., Estelle v. McGuire, 502 U.S. 62, 75 n. 5 (1991) ("[W]e express no opinion on whether state

4   law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to

5   show a propensity to commit a charged crime.")  Furthermore, as stated by the California Court

6   of Appeal, the gang expert did not state specifically that Petitioner's tattoos showed that he had a

7   propensity for violence.  Instead, he testified that the tattoos "are a way of sort of gangsters

8   because they are more visible.  Intimidating people and intimidating or projecting the sense of

9   status by tattooing." (Reporter's Tr. at p. 1096.)

10        Petitioner also alludes to the Equal Protection Clause in arguing that his equal protection

11   rights were violated by the admission of this tattoo evidence.[3]  Similar to Claim IV however, he

12   fails to show that he was intentionally treated differently that others similarly situated and he

13   does not show that he was intentionally discriminated against based on his membership in a

14   protected class.   For the foregoing reasons, Petitioner is not entitled to federal habeas relief on

15   Claim V.

16        F.  Claim VI

17        In Claim VI, Petitioner argues that his due process and equal protection rights were

18   violated "when the jurors were handed the prosecutor's chart as a guide to their deliberations,

19   and was prejudicial by serving as a reminder that the prosecution had the correct view of the

20   case." (Pet'r's Pet. at p. 10.)  The California Court of Appeal analyzed this Claim on the merits

21   on direct appeal and stated the following:

22            Before closing argument, the prosecutor submitted a chart he
              proposed to use for closing argument, and which he wanted to let
23            the jury take into the jury room.  Defense counsel objected on the
              grounds the instructions were "more than sufficient."  The trial
24

25        [3]  As with the equal protection arguments in Claim IV, it appears as if this argument may
     be unexhausted as well.  However, the claim can be decided on the merits so long as it is not
26   "colorable."  See Cassett, 406 F.3d at 624.

court asked defense counsel whether the chart contained any legal inaccuracies.  Defense counsel replied that the chart did not appear to be intentionally deceptive, but that it did not spell out the rules completely.  Defense counsel was particularly concerned about information provided under an asterisk.  The trial court allowed the prosecutor to put the chart on the wall and to give the jury copies to hold during closing argument, but deferred ruling on whether it could go into the deliberation room.

During closing argument, the prosecutor gave copies of the chart to the jury.  He explained that the chart was a kind of road map to work through the case.  He explained that the chart showed two different charges – murder and being an active participant in a criminal street gang.  He told the jury they would have to determine guilty or not guilty as to the two charges.  He then explained that the jury would have to decide whether the murder was first or second degree.  He said that if the jury found the murder to be first degree, it would have to determine whether there were special circumstances, but that if the jury found the murder to be second degree, there need be no special circumstances findings.

As to the asterisk, the prosecutor said it referred to the different theories for a finding of murder, and told the jury it did not have to agree as to which one of the theories applied as long as the finding of murder or murder in the first degree was unanimous.  Prior to the defense counsel's closing argument, the court told the prosecutor to take off the district attorney's label and delete the asterisks and footnotes.  The court stated it would let the chart go to the jury room as a supplement to the written instructions.  Thereafter, defense counsel used the chart to argue Roque Bejarano was guilty of first degree murder, lying in wait and felony murder.

The chart that was sent to the jury lists in chart form the crimes for which defendant was being tried, the possible degrees, the special circumstance allegations, and the enhancements.  The trial court instructed the jury that the chart would be included as page 114 of their instructions as a supplement to the instructions.  "It's not intended to be a detailed explanation of all the elements required for everything that's depicted on the chart.  That explanation is within the written instructions that you have there in your binder.  If you perceive a conflict between the chart and any of the written instructions, follow the written instructions, okay?"

The chart does not contain any error of law or fact, nor does defendant argue it contains any such error.  Instead, he argues the chart implied the prosecution's analysis of the case was the correct one.

Section 1137 provides that the jury may take to the deliberation room documentary evidence, written instructions given, and notes they have taken on the testimony.  While the trial court's decision

1    to make the chart a supplement to the written instructions is
     certainly irregular, defendant has shown no prejudice.  The chart
2    sent to the jury does nothing more than set forth the allegations of
     the complaint in graphic form.  The task of the jury is to analyze
3    the evidence within the framework of the crimes charged.  The
     chart was merely an aid to that end, and did not favor one side over
4    the other.  No prejudice can be implied where defendant does not
     make any showing that the chart contained information not
5    contained in the instructions, that the jury actually used the chart in
     its deliberations, or that the jury obtained an improper impression
6    from the chart.  (See People v. Herrera (1917) 32 Cal.App. 610,
     615 [defendant not prejudiced by fact that jury took non-
7    documentary evidence into the jury room in the absence of
     showing that jury used such evidence in its deliberation or received
8    any improper impression therefrom].)

9    Defendant argues the trial court erred in telling the jurors to follow
     the written instructions if there was a conflict between the
10   instructions and the chart.  He argues the jury may have relied on
     the chart entirely if they did not perceive any discrepancy with the
11   instructions.  It is not possible that the jury relied entirely on the
     chart.  As the trial court instructed, it was not intended as a detailed
12   explanation, which could only be found only in the instructions.
     The chart itself contains only the names, and none of the elements
13   of the various crimes, enhancements, and special circumstances
     alleged.  The jury could not have relied on the chart for any
14   information other than as an impartial flow chart that directed the
     mechanics of coming to a decision, but not the result itself.  There
15   was no error.

16   (Slip Op. at p. 51-55.)

17        A challenge to a jury instruction solely as an error under state law does not state a claim

18   in a federal habeas corpus action.  See Estelle, 502 U.S. at 71-72.  To obtain federal collateral

19   relief for errors in a jury charge, a petitioner must show that the ailing instruction so infected the

20   entire trial that the resulting conviction violates due process.  See id. at 72.  Additionally, the

21   instruction may not be judged in artificial isolation, but must be considered in the context of the

22   instructions as a whole and the trial record.  See id.  The court must evaluate jury instructions in

23   the context of the overall charge to the jury as a component of the entire trial process.  See United

24   States v. Frady, 456 U.S. 152, 169 (1982).  Furthermore, even if it is determined that the

25   instruction violated the petitioner's right to due process, a petitioner can only obtain relief if the

26   unconstitutional instruction had a substantial influence on the conviction and thereby resulted in

1   actual prejudice under <u>Brecht</u>, 507 U.S. at 637, which is whether the error had a substantial and

2   injurious effect or influence in determining the jury's verdict.

3            In this case, Petitioner does not argue that the chart itself misstated the law, rather he

4   argues that by submitting the chart to the jury, it served as a reminder that the prosecution had the

5   correct view of the case.  Petitioner is not entitled to federal habeas relief on this Claim.  First, as

6   noted by the California Court of Appeal, even defense counsel used the chart during his closing

7   argument.  (<u>See</u> Reporter's Tr. at p. 2066.)  Second, the trial judge specifically instructed the jury

8   that if the chart and the instructions were at odds, the jury was to follow the instructions as given

9   rather than the chart.  The jury is presumed to have followed this instruction.  Petitioner failed to

10  show that the chart so infected the trial that it amounted to a due process violation.

11           As with Claim IV and V, Petitioner also argues that his equal protection rights were

12  violated by the prosecutor's chart.[4]  However, he fails to show that he was intentionally treated

13  differently that others similarly situated and he does not show that he was intentionally

14  discriminated against based on his membership in a protected class.  Petitioner is not entitled to

15  federal habeas relief on Claim VI.

16                                      V.  CONCLUSION

17           For all of the foregoing reasons, IT IS RECOMMENDED that the petition for writ of

18  habeas corpus be DENIED.

19           These findings and recommendations are submitted to the United States District Judge

20  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days

21  after being served with these findings and recommendations, any party may file written

22  objections with the court and serve a copy on all parties.  Such a document should be captioned

23  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

24  _____

25           [4] As with the equal protection arguments in those claims, it appears as if this argument
    may be unexhausted.  However, the claim can be decided on the merits so long as it is not
26  "colorable."  <u>See</u> <u>Cassett</u>, 406 F.3d at 624.

shall be served and filed within seven days after service of the objections.  The parties are

advised that failure to file objections within the specified time may waive the right to appeal the

District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).  In any objections he

elects to file, Petitioner may address whether a certificate of appealability should issue in the

event he elects to file an appeal from the judgment in this case.  *See* Rule 11, Federal Rules

Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability

when it enters a final order adverse to the applicant).

DATED:  March 3, 2011

TIMOTHY J BOMMER
UNITED STATES MAGISTRATE JUDGE

44